[No. 3075.]

## Secundino Escareno *v.* The State.

1. Practice—Manslaughter—Charge of the Court.—Objection that the court erred in omitting to charge the law of manslaughter was first made in the motion for new trial. The rule under such circumstances is, that this court will not interfere unless such omission appears calculated to result to the prejudice of the defendant.

2. Same—Evidence.—The Mexican term "cabron," meaning that the person to whom it is applied consents to the prostitution of his wife, was claimed by the defendant to have been applied to him by the deceased, and upon that ground it is urged that, being an insult to his wife, the homicide could not be murder, but manslaughter, and that the omission of the court to so charge the jury was error. It was proved that some one of several parties present used the word "cabron," but it was not proved that it was the deceased who used it. *Held,* that this evidence was insufficient to disclose prejudice to the defendant in the omission to charge the law of manslaughter. Note, also, that the motion for new trial sets up evidence which clearly discloses that the insulting word was not the moving cause of the homicide.

3. Same—Verdict—Presumption of Law.—The validity of the conviction is assailed upon the ground that the verdict was not translated into the language of the defendant, who is a Mexican. In the absence of a bill of exceptions presenting such fact, this court cannot proceed upon the assumption that everything stated in the motion for new trial is true, when the record is silent on the subject.

4. Same.—Primarily the presumption of law is in favor of the regularity of all the proceedings in the case. The record fails to show affirmatively whether the defendant was or was not present when his motion for new trial was acted upon. *Held,* that under such circumstances, his presence at the time is presumed on appeal.

5. Same—Waiver.—In the assignment of errors it was shown that the defendant's right to be present when his motion for new trial was being acted upon was waived by his counsel. Under such circumstances, even though the record showed affirmatively that the defendant was not present, the presumption obtains that the waiver was authorized by the

defendant, and the defendant is bound thereby, unless he shows affirmatively that he did not authorize the waiver.

6. SAME—NEW TRIAL.—See the statement of the case for newly discovered evidence set up in motion for new trial, but *held* not to be of such character as would tend, if true, to justify, extenuate or mitigate the homicide; wherefore the motion for new trial was properly overruled.

7. PRACTICE—TRANSCRIPT.—See the opinion for suggestions to trial judges respecting the incumbrance of transcripts with foreign matter.

8. MURDER—FACT CASE.—See evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Bexar.  Tried below before the Hon. G. H. Noonan.

The indictment charged the appellant with the murder of one Venturo del Toro, in Bexar county, on the sixteenth day of April, 1880.  The trial of the appellant resulted in his conviction of murder in the first degree, and the penalty of death was awarded him.

Ysidoro Rosas was the first witness for the State.  He testified that he was present when the defendant killed Venturo del Toro in the spring of 1880.  Del Toro, Jesus Basques and witness were *en route* from the Medina river to San Antonio, with wood for sale.  Within six miles of San Antonio the party met a Mr. Campbell and the defendant in a two horse wagon, going from San Antonio toward the Medina.  After the wagons had passed each other some little distance, Campbell's wagon stopped, and witness heard the defendant say that he was going down to the mission.  Defendant got out of Campbell's wagon and started off on the lower side of the road in the direction of the mission below San Antonio.  Campbell's wagon started on; that of the witness and his party had not stopped, but kept on toward San Antonio.  Witness and party had traveled perhaps two hundred yards from where they met Campbell's wagon when the defendant came up to Del Toro, who was riding on the driver's or saddle mule.  He asked Del Toro to get down.  Del Toro began dismounting, and just as one foot touched the ground, and while the other was still in the stirrup, the defendant shot and killed him.

When witness saw Del Toro falling, he jumped off his wagon and ran.  The defendant called to witness, but the witness did not stop, and the defendant fired at him, the ball passing through the left shirt sleeve of the witness above the elbow.

Witness ran on to the house of Francisco del Toro, the father of the deceased, and told him of the killing of the deceased. Francisco del Toro and the witness returned to the scene of the shooting and found the deceased lying dead, with a bullet hole through his head. This all occurred in Bexar county, Texas, some time in the spring of 1880. The defendant on trial is Escareno, the man who shot and killed the deceased.

Cross-examined, the witness stated that no conversation passed between the defendant and Del Toro before the shooting. The defendant merely went up to the deceased, told him to dismount, and shot him as he was in the act of dismounting. They had no fight before the shooting, and witness did not know why the defendant killed the deceased. Del Toro made no effort to cut the defendant with a knife, nor did he have a knife at the time. There was no road leading to the mission from the place where the killing occurred. Witness was between ten and eleven years old when the killing occurred, and is now fourteen. Witness had not disclosed to any one what his testimony on this trial would be. The fatal shot powder burned the hair on the head of deceased.

Francisco del Toro, the father of the deceased, was the next witness for the State. He testified that the deceased was killed on the sixteenth day of April, 1880. Witness was at his ranch when the killing occurred. Ysidoro Rosas brought the news to the witness. Witness and Rosas went together to the scene of the killing, and found the deceased lying dead, shot through the head. The body was taken home and buried. The witness knew nothing more about the killing of the deceased than he was told.

J. M. Penaloza testified that he was a deputy sheriff of Bexar county, and had held that office for several years. He received a *capias* for the defendant a short time after the killing, and retained it until his arrest. The defendant was hunted vigorously but eluded apprehension until six or seven months before this trial, when he was traced to Hays county. Witness arrested him near Kyle, in Hays county. The defendant was going then under an assumed name, the given name being Pedro. Witness did not learn his assumed surname. At this point the State rested.

L. H. Campbell was the first witness for the defense. He testified that he hired the defendant in San Antonio on the fifteenth day of April, 1880. Next day the defendant came and put a

rolled up blanket into his, witness's, wagon. Defendant was drunk at that time. He took a seat by the witness in the wagon and they started out of town. The defendant was then apparently in a stupor. He seemed to notice nothing, but slept until they had traveled about six and a half miles, when they met Basques, Rosas and the deceased. Witness told defendant there was "Pedro." He looked up; the boy turned his head and drove on. As witness and defendant passed the wagons, a man who was walking behind the hindmost wagon looked up toward the defendant and said something about "cabron." Witness did not know to whom he applied this epithet, but he was looking toward the defendant. (It was conceded that "cabron" means a man who consents to the prostitution of his wife.) Witness drove on about fifty yards, when the defendant caught the lines from his hands, stopped the team and said something about "mission" or "permission." Witness saw that he wanted the team stopped, and assented. Defendant then went to the rear of the wagon, unrolled his blanket and took therefrom his six shooter, which he buckled around his waist. He then replaced his blanket in the wagon. Up to this time the witness did not know that defendant had a pistol. After buckling on his six shooter the defendant went to the other side of the wagon, took up his provision sack, from which he procured a piece of bacon, and offered it to witness. Witness declined it, and the defendant then laid it in the wagon and went off into the brush, on the lower side of the road and in the direction of the mission. Witness saw no more of him, but in a short time heard two reports of a pistol. It was the man who was walking in the rear of the wagon who used the word "cabron." The witness did not know whether or not that man was the deceased.

Cross-examined, the witness stated that he did not see the shots fired, as he had then passed out of sight. They were fired back on the road over which witness had just passed. They were not fired in the direction of the mission. Defendant did not say that he was going to the mission when he stopped the witness's team. No road led to the mission from the point where the defendant got out.

The motion for new trial raised the questions considered in the opinion. It was supplemented by the affidavit of defendant's counsel, setting up, in substance, the following newly discovered evidence: That one Shields, a witness subpœnaed in behalf of the defendant, told affiant after the trial that one Reyas

Ojedas, who lived in the neighborhood of the deceased, could and would on a new trial testify that he, Ojedas, knew that the deceased and his family were implicated in the theft of certain horses, and that the defendant had so reported on them, for which reason the deceased and other members of his family had said that they would either kill or run the defendant from the country; that, prompted by the same motive, the deceased, with assistance, enticed the defendant to an unfrequented place, a few weeks before the killing, and beat him violently; and that Shields would testify that other persons with whose names he was not acquainted would testify to the same facts; that Shields would further testify that one Woodruff lived near him; that he told the deputy sheriff, Penaloza, who had a subpœna for Woodruff, where he, Woodruff, lived, and proffered, if deputized, to serve a subpœna on Woodruff and have him in attendance upon court, but that said deputy sheriff Penaloza declined to so deputize him. Affiant further affirmed that he was led to believe by the deputy sheriffs to whom he gave subpœnas for Woodruff, that Woodruff had left the country, wherefore he did not, as he otherwise would have done, ask for a continuance.

*G. W. A. Brantley,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant was tried and convicted of the murder of Venturo del Toro, in Bexar county. He was convicted of murder of the first degree and his punishment was assessed at death. Judgment being entered up on the verdict, and his motion for new trial being overruled, he appeals to this court.

For a reversal of the judgment, the following assignments of error are made by counsel for appellant:

1. "The court erred in not charging the jury the law applicable to manslaughter."

2. "The court erred in not causing the verdict translated to defendant, he not being able to understand the English language, as record shows; in which the verdict of the jury was written, and read in open court."

3. "The court erred in overruling the fifth ground of defendant's original motion for a new trial, as will more fully appear from the record."

4. "The court erred in not having the defendant himself

present in court at the time of the hearing and overruling of defendant's motion for a new trial, the same having been waived by counsel instead of by the defendant himself, as the law requires."

First assignment: Did the evidence, or any evidence, adduced on the trial require of the court a charge upon manslaughter? If there was evidence requiring such a charge, the omission being complained of first in the motion for new trial, were the rights of defendant injured, or was the omission calculated to injure his rights?

If manslaughter be in this case, it is so solely by reason of the following evidence: Ysidoro Rosas, Venturo del Toro and Jesus Basques were going from Medina to San Antonio with wagons loaded with wood. When within about six and one-half miles of San Antonio they met Mr. Campbell and defendant in a wagon going in the direction of Medina. After the wagons had passed each other, Campbell saw a man walking behind the hindmost wagon of the company, going to San Antonio. This man looked up toward the defendant and said "cabron." (It is admitted that "cabron" means a man who consents to his wife's prostitution.) Campbell drove on about fifty yards, when defendant caught the lines and stopped the team, and said he was going to the mission. He got out of the wagon, went to the rear and took his pistol from his blanket, and buckled it around him and entered the brush on the same side of the road. The deceased and his party had got on about two hundred yards, when defendant overtook them, asked the deceased to dismount, and while in the act of dismounting — with one foot on the ground and the other in the stirrup — the deceased was shot by the defendant through the head and instantly killed.

Now it is urged by counsel for defendant that the word "cabron" was an insult to his wife, and that, if the killing was induced by this, it would not be murder, but manslaughter, and that therefore the court erred in failing to charge the law relative to this matter, contained in the fourth subdivision of Article 597, Penal Code.

It must be borne in mind that there was no objection to this omission, nor instructions asked supplying the alleged defect. But the vital question presented by the statement of facts is whether or not the deceased was the person who spoke the insulting words. If not, certainly defendant cannot complain of

this matter.   And the rule being that when there was no objection made at the time, nor the omission sought to be cured by requested charges, it must be made to appear to this court that the error or omission was calculated to injure the rights of the defendant.   Looking to the record in this case, does it appear to us that the omission in the charge complained of was calculated to injure the defendant?   If it appeared from the evidence that Venturo del Toro (the deceased) was the person who used the word "cabron" to defendant just before the homicide, this being an insulting word toward a female relative of defendant, it would be made apparent that the court should have charged the law relating to this matter.   But how can we say and rule that the omission was not only error, but such error as was calculated to injure the rights of the defendant, when the proof fails to show that it was the deceased who spoke the insulting words?   The injury must appear, manifest itself, and not be assumed by this court.

But in fact and reality was this insulting language toward defendant's wife the true cause of this homicide?   Let us look a little further into this record.   In his motion for new trial appellant swears that upon another trial he will prove by certain witnesses that Del Toro and his friends had threatened to run him out of the country or kill him.   It is not stated in this motion nor the supporting affidavit that Del Toro or any of his party did any act whatever tending to show any intention to execute these threats.   If the facts were all established upon another trial, as set forth in the motion for new trial, nothing less than a homicide instigated purely by revenge would be developed by or result from these facts.

Here then we have, no doubt, the moving and real cause of this calm, cool and deliberate homicide.   It was not prompted by the insult to his wife, but by a wicked desire for terrible and bloody revenge, growing out of quite another matter.   Looking then to the whole record in the case, it does not appear to us that the omission in the charge complained of was calculated to injure the rights of defendant, or that for this supposed error the judgment will be reversed.

The second and fourth assignments of error will be considered together.   We are not informed by the record whether the verdict of the jury was translated into the language of the defendant or not.   There is no bill of exceptions reserved.   Certainly, then, this court will not proceed upon the assumption that every-

thing stated in the motion for new trial is true; nor are we to be understood as intimating that this was necessary.

These observations apply also to the fourth assignment. It does not affirmatively appear from the record that defendant was not present when his motion for new trial was overruled, nor does it affirmatively appear that he was present. We therefore presume that he was present, as the presumption is in favor of the legality of all the steps taken in the case. But suppose the record shows affirmatively that he was not present when his motion for new trial was overruled, in the assignment of errors it is conceded that this right was waived by his counsel. The question then is, is defendant bound by this waiver? What is the presumption? It is that his counsel was authorized by defendant to make the waiver, and that defendant is bound by it unless he shows that in fact he did not so authorize it.

These are nice questions, and we allude to them for the purpose of calling the attention of the trial judges to the necessity of keeping the records purged of all such matters. Why will the learned judges presiding hazard well deserved and otherwise certain punishment upon a decision of such questions? questions which have a place in the record not of necessity, but by reason of inexcusable negligence and indifference to the solemn proceedings made necessary by the Code to be pursued, in order to the due and proper administration of the criminal laws and the certain punishment of those who are guilty of their violation.

If a citizen is placed upon trial for felony, and especially for capital felony, it is the duty and should be the aim of the trial courts to make the record affirmatively show that each and every step necessary to a due and legal trial has been made or taken, and the greatest caution should be used to keep the record clear of all doubtful questions of practice. There being nothing in the record showing that defendant was not present when his motion for new trial was overruled, this assignment is not well taken.

By reference to the fifth ground urged in the motion for new trial, it will be found that an explanation or reason is therein sought to be given to excuse the supposed negligence of defendant's counsel in not having certain witnesses served with process. To this matter the third assignment refers. As we have stated above, the facts which appellant swears he expects to establish by these witnesses would not, if true, tend to justify,

extenuate or mitigate the offense or killing. On the contrary, they would, as presented to us by the record, tend with great force to prove a homicide upon express malice. This being the case, the court below did not err in refusing a new trial.

Counsel for defendant does not insist in his assignments of error that the verdict of the jury is not supported by the evidence. In this we commend him, for to our minds this unfortunate man is clearly shown by the evidence to be guilty of premeditated and deliberate murder. We have examined all the assignments of error, as well as the grounds relied upon for a new trial, and find nothing in this record which would authorize the reversal of this judgment. The judgment is affirmed.

*Affirmed.*

Opinion delivered April 30, 1884.